IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

NICO LUCIANO VASQUEZ,

       Petitioner,            No. CIV S-02-1925 DFL KJM P

   vs.

JOE McGRATH, Warden,

       Respondent.          FINDINGS AND RECOMMENDATIONS

_____/

       Petitioner is a state prison inmate proceeding pro se with a petition for a writ of habeas corpus under 28 U.S.C. § 2254.  He challenges his San Joaquin County convictions for murder and gang activities, the findings that he personally used a knife and committed the crime for the benefit of a street gang, and his ultimate sentence of twenty-six-years-to-life in prison.

I.  Factual Background

       The court adopts the factual recitation from the Court of Appeal's opinion, which accurately reflects this court's own reading of the record:

> Primotivo Villasana was found dead with numerous stab wounds
> in Stockton's Weber Park the night of February 2, 1997.  Known as
> "Tivo" or "Primo," the victim was a heroin addict and former
> member of Northern Structure, a Northern California gang
> composed of prison parolees and street gang members with ties to
> the Nuestra Familia prison gang.  Witnesses had observed a fight in
> the park involving two or three men against one.  However, none

1

came forward with information on the killers during the initial investigation.

The case broke when Stockton Police Detective Cliff Johnson interviewed Tony Gimenez on April 9, 1997, the day after his arrest for the robbery of Yum Yum Donuts. Giminez, the leader of the Stockton regiment of Northern Structure, agreed to provide testimony in the investigation and prosecution of gang members in exchange for a substantially reduced robbery sentence. He named Vasquez, his second in command, and Trent, an associate of Northern Structure, as the persons responsible for Villasana's death. Giminez explained that Villasana was classed as a "dropout" for refusing to carry out his gang responsibilities while imprisoned at Deuel Vocational Institute (DVI). He said a guy named "Lucky" told him in 1992 that Villasana was on the gang's hit list. Gimenez spread the information when he was released from DVI. Vasquez telephoned Giminez the night of the 1997 murder. After asking if Gimenez remembered "Tivo," Vasquez said, "We got him." DNA tests on bloodstains placed Vasquez at the scene of the crime.

The district attorney went to trial on the theory the murder was the gang execution of a dropout to advance the defendants' status in Northern Structure. He initially intended to rely on testimony from Gimenez and Detective Nick Garcia, his gang expert. Additional key evidence surfaced during trial.

Betty Talaga, Vasquez's former girlfriend, had denied knowledge of the killing and Vasquez's gang connections in her preliminary hearing testimony. She was scheduled to testify at defendants' trial, but approached Detective James Ballard with additional information on December 16, 1998, the second day of trial testimony. The district attorney and FBI obtained detailed statements from Talaga on December 16 and 17. The district attorney disclosed the turn of events on Monday, December 21, after safety concerns had been addressed. He provided the defense with tapes of the Talaga interviews and other related discovery.

Talaga testified at trial on January 13, 1999. She stated that Vasquez and Trent helped her move into an apartment near Weber Park on February 2, 1997. Defendants went to a nearby store while Talaga continued unpacking. While they were gone, Villasana came to Talaga's front door. Although Villasana was staggering and appeared to be drunk, Talaga did not consider him threatening. Defendants returned at that point, and Vasquez yelled, "What the fuck are you doing at my door?" He told Talaga to close the door. She heard Villasana respond, "What's up, Nico? Why you got to talk to me like that?"

Defendants remained outside on the steps talking and drinking with Villasana, and Talaga continued to unpack. Vasquez came into the

apartment twice - once to get more beer, and once to take something she could not see from a kitchen drawer that contained knives.  She later identified a broken knife handle and knife blade found at the scene, and testified her knives were not broken when she last saw them.

Vasquez told Talaga he was going for a walk around the corner. She watched defendants and Villasana head toward the park as it started to get dark.  Vasquez returned about 45 minutes later, went to the drawer, and got a butcher knife with a wooden handle.  He told Talaga the first knife had broken because it was too skinny. Vasquez said he needed the knife to take care of his business. Talaga testified Vasquez was mad, out of breath, but uninjured at the time.

Vasquez returned 15 or 20 minutes later, looking like he had been fighting.  His shirt was torn, and he was bleeding.  He had a bloody knife with him, which Talaga put in the sink.  Vasquez told her to clean it with alcohol or Clorox.  He also told Talaga to say she had not seen him if the police came.  Talaga cleaned the wound on Vasquez's hand, and put a towel over it.  Vasquez took her car, saying he was going to take Trent home, then return.  Vasquez did not return to the apartment that night.

Talaga saw Vasquez at his sister's house several days after Villasana was killed.  He showed Talaga a newspaper article about the murder and explained, "This is what I did last night."  He said he threw the clothes he was wearing into a creek behind his mother's house.  Vasquez later told Talaga he cut Villasana's throat, and one of the knives broke during the assault.  Vasquez and Trent met with Talaga to discuss what to tell police about the night of the murder.

At some point after the murder, Talaga watched while Trent had a star tattooed under his eye.  Vasquez said, "He's a killer now." Talaga also heard Vasquez tell Trent "he done killed a man."

Xavier Lozano provided additional evidence the crime was gang-related.  The court ruled at the close of in limine motions that Lozano would not testify due to a conflict in representation, and the potential need to sever Trent's trial.  The district attorney pressed the argument he needed Lozano's testimony.  The court changed its ruling on January 7, 1999, finding no actual conflict, and that the defense had sufficient time to review discovery on Lozano.

Lozano testified on January 14, 1999, near the end of the prosecution's case.  He had participated in the Yum Yum Donuts robbery, and entered into a plea agreement with federal authorities which resulted in a prison sentence of five years in exchange for cooperation with law enforcement.  Lozano stated he previously

held the highest position in Northern Structure, responsible for overall security inside and outside of prison. He testified that Vasquez had been a gang member for three or four years, and Trent was a sympathizer. While Lozano was imprisoned at Pelican Bay, he received instructions that all dropouts in Stockton should be killed. He relayed the information directly to Gimenez and Vasquez upon his parole. Lozano explained that by killing Villasana, defendants would gain status within Northern Structure, and possibly become eligible for membership in Nuestra Familia.

Defense counsel declined to cross-examine Lozano. Trent's attorney, Judy Hansen, worried about the possible conflict in representation. Both she and Jeff Silvia, Vasquez's attorney, complained they had insufficient time to prepare for cross-examination due to the late discovery on Lozano.

Thereafter, Trent testified on his own behalf. He acknowledged he left Talaga's apartment with Vasquez and Villasana after dark on February 2, 1997, to get more beer. As the men neared the park, Trent walked ahead of Vasquez and Villasana. Trent turned when he heard a commotion, and saw Vasquez and Villasana wrestling on the ground. He asked Vasquez what was happening, but got no answer. Trent testified he saw Vasquez on top of Villasana, repeatedly punching him. He did not see a knife. Trent denied kicking, punching, or touching Villasana in any way.

Trent said, "Come on, Nico, let's go," and started walking away from the park. Vasquez eventually caught up with Trent, and they returned to Talaga's apartment. He watched Talaga clean the cut on Vasquez's hand, but denied seeing Vasquez give Talaga a knife. Vasquez never told Trent what happened in the park. Trent testified he got the star tattoo in November or December 1996, and it had no special significance.

In closing argument, defense counsel maintained Villasana's killing was not premeditated, first degree murder. Instead, Villasana had picked a fight, possibly related to his quest for heroin, and got in over his head. The defense insisted Villasana was not a threat to Northern Structure. He had been on the hit list since 1991 or 1992, and there was no status to be gained in killing him.

Answer, Ex. A at 3-8 (Court of Appeal Opinion).

II. AEDPA Standards

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). Also, federal habeas corpus relief is not available for any

claim decided on the merits in state court proceedings unless the state court's adjudication of the

claim:

>   (1) resulted in a decision that was contrary to, or involved an
>   unreasonable application of, clearly established federal law, as
>   determined by the Supreme Court of the United States; or
>
>   (2) resulted in a decision that was based on an unreasonable
>   determination of the facts in light of the evidence presented in the
>   State court proceeding.

28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA").  See Ramirez v. Castro,

365 F.3d 755, 773-75 (9th Cir. 2004) (Ninth Circuit affirmed lower court's grant of habeas relief

under 28 U.S.C. § 2254 after determining that petitioner was in custody in violation of his Eighth

Amendment rights and that § 2254(d) does not preclude relief); see also Lockyer v. Andrade, 538

U.S. 63, 70-71 (2003) (Supreme Court found relief precluded under § 2254(d) and therefore did

not address the merits of petitioner's Eighth Amendment claim).[1]  Courts are not required to

address the merits of a particular claim, but may simply deny a habeas application on the ground

that relief is precluded by 28 U.S.C. § 2254(d).  Lockyer, 538 U.S. at 71 (overruling Van Tran v.

Lindsey, 212 F.3d 1143, 1154-55 (9th Cir. 2000) in which the Ninth Circuit required district

courts to review state court decisions for error before determining whether relief is precluded by

§ 2254(d)).  It is the habeas petitioner's burden to show that he is not precluded from obtaining

relief by § 2254(d).  See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

    The "contrary to" and "unreasonable application" clauses of § 2254(d)(1)  are

different.  As the Supreme Court has explained:

/////

---

[1]  In Bell v. Jarvis, 236 F.3d 149, 162 (4th Cir. 2000), the Fourth Circuit Court of Appeals
held in a § 2254 action that "any independent opinions we offer on the merits of constitutional
claims will have no determinative effect in the case before us . . .  At best, it is constitutional
dicta."  However, to the extent Bell stands for the proposition that a § 2254 petitioner may obtain
relief simply by showing that § 2254(d) does not preclude his claim, this court disagrees.  Title
28 U.S.C. § 2254(a) still requires that a habeas petitioner show that he is in custody in violation
of the Constitution before he or she may obtain habeas relief.  See Lockyer, 538 U.S. at 70-71;
Ramirez, 365 F.3d at 773-75.

1

2

3

4

5

6

7

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

8   Bell v. Cone, 535 U.S. 685, 694 (2002). A state court does not apply a rule different from the

9   law set forth in Supreme Court cases, or unreasonably apply such law if the state court simply

10  fails to cite or fails to indicate an awareness of federal law. Early v. Packer, 537 U.S. 3, 8

11  (2002).

12      The court will look to the last reasoned state court decision in determining

13  whether the law applied to a particular claim by the state courts was contrary to the law set forth

14  in the cases of the United States Supreme Court or whether an unreasonable application of such

15  law has occurred. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002), cert. dismissed, 538 U.S.

16  919 (2003). Where the state court fails to give any reasoning whatsoever in support of the denial

17  of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court

18  must perform an "independent review of the record to ascertain whether the state court decision

19  was objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). In other

20  words, the court assumes the state court applied the correct law, and analyzes whether the

21  decision of the state court was based on an objectively unreasonable application of that law.

22      It is appropriate to look to lower federal court decisions to determine what law has

23  been "clearly established" by the Supreme Court and the reasonableness of a particular

24  application of that law. See Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 1999).

25  /////

26  /////

6

III.  <u>Closed Hearings And The Right To A Public Trial (Ground One)</u>

Petitioner argues his right to a public trial was violated by defense counsel's

exclusion from a series of hearings requested by the prosecution.  Am. Pet. at 10-14.  The Court

of Appeal rejected the challenge:

> We have reviewed the record, including what the statutes authorize
> as "in camera" hearings . . ., to confirm defendants were aware of
> the discovery issues addressed by the court either before or after
> the hearings were conducted.  Defendants do not claim they were
> prejudiced by the erroneous handling of confidential information
> and witness identities under section 1054.7 [of the Penal Code] and
> Evidence Code section 1042.  We have already alluded to
> legitimate concerns regarding witness safety.  We therefore find no
> issue for consideration in this appeal.

Answer, Ex. A at 38-39 (citation, footnote omitted).

This court has reviewed the following <u>in camera</u> proceedings, which have been

provided under seal to this court: May 28, 1998 (RT 5-17), May 29, 1998 (RT 20-46), October

21, 1998 (RT 180-190, 241-248), November 19, 1998 (RT 505-514), December 17, 1998 (RT

1210-1236), December 18, 1998 (RT 1287-1296, 1358-1360), and January 6, 1999 (RT 2030-

2035).[2]  The Court of Appeal's characterization is correct: defense counsel were aware of the

general subjects, discovery issues, and security concerns explored at the hearings.  Indeed,

defense counsel were present at portions of the hearings on November 19, 1998 (<u>see</u> RT 506) and

December 17, 1998 (<u>see</u> RT 1210).

In <u>Waller v. Georgia</u>, 467 U.S. 39 (1984), the Supreme Court considered whether

the Sixth Amendment's guarantee of a public trial proscribed the closure of a seven day long

suppression hearing.   The court concluded that this pre-trial hearing nevertheless was part of the

"public trial" contemplated by the Constitution:

---

[2]  In an abundance of caution, the court asked respondent to provide copies of all the <u>in camera</u> proceedings in state court.  Two of these, held on October 19, 1998 (RT 62-74) and December 22, 1998 (RT 1462-1475), were initiated by defense counsel; the prosecutor was excluded.  The state Court of Appeal sent these under seal directly to this court, which has reviewed them as well.

> The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions....
>
> In addition to ensuring that judge and prosecutor carry out their duties responsibly, a public trial encourages witnesses to come forward and discourages perjury.
>
> These aims and interests are no less pressing in a hearing to suppress wrongfully seized evidence. As several of the individual opinions in Gannett[3] recognized, suppression hearings often are as important as the trial itself.   In Gannett, as in many cases, the suppression hearing was the only trial, because the defendants thereafter pleaded guilty pursuant to a plea bargain.
>
> In addition, a suppression hearing often resembles a bench trial: witnesses are sworn and testify, and of course counsel argue their positions. The outcome frequently depends on a resolution of factual matters.  The need for an open proceeding may be particularly strong with respect to suppression hearings. A challenge to the seizure of evidence frequently attacks the conduct of police and prosecutor.  . . . The public in general also has a strong interest in exposing substantial allegations of police misconduct to the salutary effects of public scrutiny. In sum, we hold that under the Sixth Amendment any closure of a suppression hearing over the objections of the accused must meet the tests set out in Press-Enterprise[4] and its predecessors.

Id. at 46-47 (internal citations and quotations omitted).  In United States v. Gagnon, 470 U.S. 522, 526 (1985) (per curiam), the court noted that an in camera ex parte communication between a juror and the judge would not violate any constitutional rights.

Whether an in camera hearing to explore concerns for witness security and the dissemination of certain police reports with identifying information to the defendants, held in the absence of the defendants and defense counsel, violates the right to a public trial has not been settled.  The cases that have addressed the application of the Sixth Amendment to an in camera hearing have not provided clear guidance.

---

[3]  Gannett v. DePasquale, 443 U.S. 368 (1979).

[4]  Press-Enterprise Co. v. Superior Court of California, 464 U.S. 501 (1984).

1          In Rovinsky v. McKaskle, 722 F.2d 197, 201 (5th Cir. 1984), the Fifth Circuit

2   Court of Appeals found a Sixth Amendment violation when the trial court held hearings in

3   chambers on the prosecutor's motion to limit cross-examination of two witnesses.   However, in

4   United States v. Norris, 780 F.2d 1207 (5th Cir. 1986), the same Court of Appeals found no

5   constitutional violation when the trial court held a number of chambers conferences regarding

6   juror issues, jury instructions and admissibility of a chart used in witness examination, the latter

7   of which was objected to.  The court concluded that "[n]on-public exchanges between counsel

8   and the court on such technical legal issues and routine administrative problems do not hinder the

9   objectives which the Court in Waller observed were fostered by public trials."  Norris, 780 F.2d

10   at 1210.

11          The Ninth Circuit has recognized that "trivial closures" do not implicate the Sixth

12   Amendment's right to a public trial.  United States v. Ivester, 316 F.3d 955, 959 (9th Cir. 2003).

13   "Routine" matters with no bearing on guilt or innocence are not subject to the Sixth Amendment

14   guarantees.  Id.  The hearings in the instant case, though perhaps as not as routine as the

15   exploration of jurors' concerns for their security in Ivester, nevertheless were related to the

16   security of witnesses and other investigations rather than petitioner's guilt or innocence.

17          Other courts have recognized that the right to a public trial must give way to

18   legitimate security concerns.   In Ayala v.  Speckard, 131 F.3d 62, 72 (2d Cir. 1997) (en banc),

19   the court found no Sixth Amendment violation when trial courts closed the courtrooms during

20   the testimony of undercover officers who "would soon be returning in an undercover capacity to

21   the same areas where the defendants had been arrested."  The hearings in the instant case focused

22   on similar questions of witness safety.

23          In light of these authorities, this court cannot say the state Court of Appeal erred

24   in finding that the in camera proceedings did not violate petitioner's constitutional rights.

25   /////

26   /////

9

IV.  <u>Evidence Of Petitioner's Prior Violence (Ground Two)</u>

    A.  <u>Background</u>

        Dolores Gutierrez was Villasana's ex-wife.  She described Villasana as a heroin addict with a friendly and helpful demeanor, who was afraid of gang violence because of his dropout status.  RT 1017-1018, 1020.[5]  She also said he often kept his clothes at her daughter's apartment near Weber Park.  RT 1017-1018.

        On cross-examination, Judith Hansen, Trent's counsel, asked whether Gutierrez and Villasana had dated for several years before marrying.  Gutierrez said they had not dated more than a year and added that Villasana was a good person and respectful to her and her children and grandchildren.  RT 1021.  Defense counsel asked if Villasana's personality changed when he was drinking; Gutierrez said it would once in awhile when "he wanted more drugs."  RT 1023.  She acknowledged she had called Villasana's parole officer after he threatened to kill her, but said "but he was always talking, you know. . . ."  RT 1023.

        James Silvia, Vasquez's counsel, also asked about the threat, establishing that Gutierrez was "terrified" after Villasana threatened her.  RT 1030.  When he asked whether Gutierrez was aware Villasana had stabbed a man in prison, the court sent the jury out.  RT 1031.

        In the following sidebar, Silivia noted, before Gutierrez was called to the stand, he had approached the bench and asked for an offer of proof; he was concerned Freitas was calling her to evoke "some sort of passion in the jury."  RT 1033.  He argued that when Freitas elicited information about Villasana's friendly demeanor, the door was opened to questions about Villasana's character for violence.  RT 1034.

        The court found Freitas's questions indeed opened the door and the defense was entitled to cross-examine.  RT 1035-1036.

---

[5] Record cites are to the clerk's and reporter's transcripts of petitioner's trial, lodged in connection with <u>Trent v. McGrath</u>, Civ.  No. S-02-1647 DFL PAN P, the habeas petition filed by petitioner's co-defendant Patrick Trent.

1    When the jury returned, Silvia asked if Gutierrez was aware Villasana had stabbed

2 a man in prison and had broken into a woman's home and held a knife to her child while

3 demanding money. RT 1045-1046. She said knowledge of the latter incident might have

4 changed her evaluation of his character, but she still considered him to be non-violent. RT 1046.

5    The parties thereafter stipulated to evidence that during a burglary of Maria

6 Garcia's apartment in 1977, Villasana held a knife to Garcia's throat and choked her while

7 demanding money. RT 3384. He threatened to kill her and her crying child if she screamed. RT

8 3384.

9    In addition, Hansen called Frank Lopez, who testified that he had an altercation

10 with Villasana at Soledad, but was not sure whether Villasana stabbed him. RT 3238. Lopez

11 had another confrontation with Villasana at Tracy. RT 3239.

12    Silvia called former Stockton police officer Dennis Mazzuola, who testified he

13 arrested Villasana during a gang intelligence sweep in October 1991. RT 3201-3202. As

14 Mazzuola approached, Villasana made a furtive motion toward his waistband. RT 3203. In

15 response to Mazzuola's order, Villasana pulled out a long-bladed kitchen knife. RT 3204.

16 Villasana appeared to be drunk. RT 3207.

17    Before the prosecution's rebuttal case, Silvia complained that

18    [O]nce I failed to object to Mr. Frietas' question to Dolores
    Gutierrez about the character of Primotivo Villasana as being
19    friendly and helpful and allowed that to come in, . . . that's when
    the door was opened.
20

21 RT 3444.

22 /////

23 /////

24 /////

25 /////

26 /////

11

The court corrected him:

> [O]nce you failed . . . to object, whether it was strategic or
> inadvertent makes no difference, the door is not open until you
> affirmatively present the evidence under 1103 (1).[6]  Now, you have
> to make the decision.

RT 3445.  The court continued, "[Y]ou chose . . . to put on the affirmative evidence.  So it's 1103 (a) evidence that kicks in what he's asking for under 1103(b)."  RT 3446.[7]

In rebuttal, the prosecution presented evidence of Vasquez's threats to Talaga and her family.  RT 3454-3455.  It also called Brian Handel, who identified Vasquez as one of a group of people who broke into his house, tied, beat, and robbed him after Handel's landlord, the father of Vasquez's then-girlfriend, had threatened to have Handel roughed up.  RT 3605, 3607.  Vasquez held a knife to Handel's neck and threatened to cut his throat.  RT 3609.  Someone in the group stabbed Handel in the back.  RT 3612.

The Court of Appeal rejected petitioner's challenge:

> Vasquez asserts that the court's reading of the statute unfairly
> forced him to choose between rebutting Gutierrez's testimony, or
> exposing himself to bad character evidence.  According to
> Vasquez, "The critical aspect is that the prosecution did not wait
> and permit the defense to freely decide but proceeded [to introduce
> good character evidence on Villasana in its case [-] in [-] chief."
> He maintains, without citation to authority, that the court's reading
> of Evidence Code section 1103, subdivision (b) deprived him of
> the constitutional right to confront the prosecution's evidence.

---

[6]  California Evidence Code § 1103 provides in pertinent part:

> a) In a criminal action, evidence of the character or a trait of
> character (in the form of an opinion, evidence of reputation, or
> evidence of specific instances of conduct) of the victim of the
> crime for which the defendant is being prosecuted is not made
> inadmissible by Section 1101 if the evidence is:
>
>   (1) Offered by the defendant to prove conduct of the victim in
> conformity with the character or trait of character.

[7]  The court made similar observations before the defense presentation.  RT 3015-3018.

12

1
2
3
4
5
6

> Here, as Vasquez notes, the prosecution was aware the defense was "considering the self-defense option." It should have come as no surprise that the district attorney made the tactical choice to introduce evidence of Villasana's good character in his case-in-chief. As a practical matter, the defense raised the self-defense issue. The court clearly recognized that Evidence Code section 1103 left the defense "on the horns of a dilemma, . . . You have choices both bad." However, this did not mean the statute as applied was so extremely unfair as to be within the very narrowly defined class of evidentiary statutes which violate the fundamental conceptions of justice.

7
8
9
10
11
12
13
14

> . . . Certainly, the statute in question here, which merely allows [evidence of the defendant's character for violence] in rebuttal to defense evidence [regarding the victim's character for violence], does not offend constitutional principles of due process. Appellant has a choice as to presenting evidence of the victim's character, which is similar to many tactical choices at trial – such as deciding whether to testify, or whether to present direct evidence of his own good character. The defense choice of strategy often makes admissible in rebuttal certain evidence which would not be admissible in the prosecution's case-in-chief. There is no due process violation in allowing the defense to govern the admission of such evidence in rebuttal. The fact that the prosecution introduced evidence of Villasana's good character does not alter the fact the defense could choose how to respond, or not respond at all.

15
16
17

> . . . . Given defendants' reliance on a self-defense theory and the state of the law, it was impossible to isolate the defense response to Gutierrez's testimony from the question of Vasquez's own character for violence.

18   Answer, Ex. A at 36-38 (internal citations & quotations omitted).

19       B. Analysis

20       Petitioner appears to argue that once Gutierrez had described Villasana's friendly

21   and helpful demeanor, the only way to exercise his right to effective cross-examination was to

22   ask and introduce evidence about Villasana's prior acts of violence, which in turn would permit

23   the prosecutor to present evidence of petitioner's violent character. He argues that this

24   undercuts his right to confront and cross-examine witnesses. Am. Pet. at 15-17.

25   /////

26   /////

1    The Confrontation Clause provides:

2    an *opportunity* for effective cross-examination, not cross-
     examination that is effective in whatever way, and to whatever
3    extent, the defense might wish.

4    The Confrontation Clause includes no guarantee that every witness
     called by the prosecution will refrain from giving testimony that is
5    marred by forgetfulness, confusion, or evasion. To the contrary, the
     Confrontation Clause is generally satisfied when the defense is
6    given a full and fair opportunity to probe and expose these
     infirmities through cross-examination, thereby calling to the
7    attention of the factfinder the reasons for giving scant weight to the
     witness' testimony.

8

9    Delaware v. Fensterer, 474 U.S. 15, 20, 21-22 (1985) (emphasis in original) (no Confrontation

10   Clause violation when prosecution expert witness was unable to recall the basis for his opinion).

11   Moreover, there is no Confrontation Clause violation when a defendant must choose between a

12   restricted examination and a more expansive one that might reveal harmful information:

13   . . . [defendant] argues that the introduction of the witnesses'
     testimony violated his sixth amendment right of confrontation.
14   [Defendant's] constitutional claim is based upon the fact that all of
     the witnesses were acquainted with him only by virtue of his
15   previous involvement in the criminal justice system.  As a result,
     [defendant] claims that he could not cross-examine them as to
16   possible bias because of the possibility that his case might be
     harmed if the jury found out about his prior involvement in the
17   criminal justice system.

18   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

19   *Van Arsdall*[8] holds that a defendant is denied his sixth amendment
     right of confrontation when the trial court *prohibits* him from
20   engaging in appropriate cross-examination. . . .While such a
     prohibition on cross-examination does state a sixth amendment
21   violation, there was no such prohibition imposed on [defendant] in
     this case. [Defendant's] decision not to cross-examine the six
22   witnesses for bias was a tactical decision made by his attorney.  It
     was not a prohibition handed down by the court.  As such,
23   [defendant] does not state a sixth amendment violation.

24   United States v. Wright, 904 F.2d 403, 405, 406 (8th Cir. 1990) (emphasis in original; footnote

25   _____

26   [8]  Delaware v. Van Arsdall, 475 U.S. 673 (1986).

14

omitted); see also Dorsey v. Chapman, 262 F.3d 1181, 1190 (11th Cir. 2001) (no confrontation clause violation when defense counsel "strategically chose not to" cross-examine two of victim's multiple personalities).

Once Gutierrez testified, without objection, about Villasana's friendly and helpful demeanor, the defense had to choose whether to ignore or attack the characterization. That the choice to attack had harmful consequences does not translate into a confrontation clause violation. As the Supreme Court has said:

> Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose.

McGautha v. California, 402 U.S 183, 213 (1971).

In light of these authorities and in the absence of clearly established federal law on choice constituting a restriction on cross-examination, this court cannot find the state Court of Appeal unreasonably applied federal law in rejecting this claim.

V.  Prosecutorial Misconduct (Ground Three)

Petitioner argues his constitutional rights were violated by repeated acts of prosecutorial misconduct, including delays in providing discovery and misrepresentations. Specifically, he alleges:

- at least six months before trial, the prosecution knew that Talaga had reported the location of the knife, but suppressed that evidence and the knife itself until trial; the knife was found to have no traces of human blood. Talaga's information about the knife showed she was not afraid to come forward because of petitioner's threats, which contradicted her trial testimony.

- the prosecutor told defense counsel that "Ann Thomas," a witness testifying under an assumed name, had refused to speak to them. At a hearing, Thomas reported that the prosecutor had never asked whether she wanted to speak to the defense.

- A police report on taking of a sample of Vasquez's blood was back-dated, which undercut the chain of custody for the blood. This was the sample used to make a DNA match with blood found at the crime scene.

/////

1 • The prosecution misled the defense about its intention to use Lozano as a witness and attempted to persuade Trent's counsel to drop her claim of a conflict of interest.

2

3 • The prosecution hid the identity of eight witnesses.

4 Pet. at 18-20.

5 The Court of Appeal rejected the claims:

6 With respect to bad faith, the record suggests both the defense and prosecution initially assumed unrealistic or overly-optimistic

7 positions regarding the court's rulings on Garcia's and Lozano's testimony. Defense counsel claimed they justifiably relied on the

8 court's initial ruling Lozano would not testify because of the conflict in representation. Similarly, the prosecution appears to

9 have assumed the court would permit Detective Garcia to recount what Lozano told him without additional, specific corroboration,

10 and Lozano would not be needed as a witness. Vasquez concedes on appeal "there is always room for a judge to change his mind."

11 His protestations to the contrary, there is nothing in the record to support the assertion the prosecution intentionally misled the

12 defense, or took its position on expert testimony in bad faith.

13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

14 The prosecution is obligated under *Brady* and its progeny to disclose evidence that is favorable to the defendant and material on

15 either guilt or punishment. Impeachment evidence falls within the requirement. However, evidence is material only is there is a

16 reasonable probability that, had [it] been disclosed to the defense, the result . . . would have been different. Here, the impeachment

17 value of Garcia's information was insignificant in light of Talaga's trial testimony.

18

19 A key witness testifying under the name of Ann Thomas placed both Vasquez and Trent at the scene of the murder. She saw three

20 men restraining and beating a fourth man in the park. Thomas testified that a man resembling Vasquez held the victim's head

21 while a man resembling Trent cut his throat. Vasquez argues the district attorney committed misconduct by misrepresenting to the

22 court Ann Thomas's unwillingness to talk to the defense before she testified.

23 The court initially found the district attorney in contempt and fined him $100. In discussions not cited by Vasquez, the court stayed

24 the fine and deferred resolution of the contempt issue while it heard Detective Ballard's explanation of his attempts to secure

25 Thomas's testimony at trial. Ballard's testimony shows the district attorney was truthful when he represented to the court that Thomas,

26 a clearly reluctant witness, did not want to be contacted by anyone.

16

1    The court deferred its contempt ruling until after trial.  There is no
     indication the court ever revisited the issue.  Nor does the record
2    support Vasquez's claim of misconduct.

3    Officer Eduardo Rodriguez took Vasquez to the hospital to draw
     the blood ultimately used in the DNA analysis.  When later asked
4    to document the event in a report, Rodriguez mistakenly inserted
     the wrong date.  Officer Rodriguez testified the evidence tag on the
5    envelope containing the blood sample listed the correct date the
     blood was drawn.  Officer Jose Martinez corroborated Rodriguez's
6    recollection of events, stating that the vial of blood was labeled
     with the correct date.  Vasquez imputes an improper purpose and
7    argues the "falsified police report" caused a misdirection of effort.
     We conclude the matter involved a simple mistake, and Vasquez
8    suffered no prejudice.

9    Answer, Ex. A at 27-28, 54-55.

10       A.  The Knife

11           Outside the presence of the jury, Officer Nick Garcia testified that in March or

12   April 1998, Betty Talaga told him she might be able to retrieve the knife used to kill Villasana

13   from a woman named Crystal.  RT 1543, 1545.  She did not "say exactly who" had used the knife

14   and Garcia did not ask, because he wanted to see if she could get it.  RT 1545, 1546.  Later,

15   Talaga told Garcia Crystal had disposed of the knife.  RT 1547.

16           He did not tell his supervisor or the prosecutor about these conversations.

17   RT 1547.

18           Talaga testified that she responded to a subpoena on December 16, 1998, and

19   decided to tell the truth, although she had lied at the preliminary hearing in December 1997.  RT

20   2584, 2625.  She was interviewed by the police, the district attorney, and the defense on

21   December 29, and later by the FBI.  RT 2584-2585.

22           Talaga confirmed she had asked Officer Garcia whether the police had the knife

23   that had killed Villasana when she called for information on the investigation into the death of

24   her brother-in-law.  RT 2627, 2629.  Eventually she provided the knife to detectives; a defense

25   expert did not find human blood on the blade.  RT 1721, 2965-68.

26           In Brady v. Maryland, 373 U.S. 83, 86 (1963), the Supreme Court recognized a

1  prosecutor's obligation to reveal exculpatory evidence, whether substantive or for impeachment

2  purposes, when such evidence is "material" to the defense.  To establish a <u>Brady</u> violation, a

3  habeas petitioner must show that the evidence was favorable to him, either because it is

4  exculpatory, or because it is impeaching; the evidence must have been suppressed by the

5  prosecution either willfully or inadvertently; and defendant was prejudiced by the non-disclosure.

6  <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999).

7          In this case, the defense ultimately learned about Talaga's contact with Garcia,

8  information which was explored at trial.  Moreover, the defense received the knife and presented

9  evidence that sophisticated testing found no traces of human blood.  Whether the prosecution

10  should have released the information sooner does not change the disposition of this case: the

11  defense received the evidence and made use of its exculpatory potential at trial.  <u>See</u> <u>United</u>

12  <u>States v. Gamez-Orduno</u>, 235 F.3d 453, 461-62 (9th Cir. 2000) (prosecutor's failure to disclose

13  ultimately not a due process violation when defense received the evidence in time to make use of

14  it).  The Court of Appeal's decision was not an objectively unreasonable determination of federal

15  law.

16      B.  <u>Ann Thomas</u>

17          Ann Thomas was a name given to the otherwise unidentified witness no. 5.  On

18  December 11, 1998, Freitas told the court that witness no. 5 "is requesting not to cooperate and

19  does not want their information released, and wants an alias."  RT 615.  He characterized her as a

20  "hostile witness."  RT 617.

21          At a hearing outside the presence of the jury, Thomas testified Freitas had never

22  told her defense counsel wished to interview her.  RT 1276.  She also described her efforts to

23  keep her identify and information secret, even from the police and the prosecutor; she told her

24  mother to call them and "tell them I don't want to have nothing to do with it."  RT 1279.  She

25  hung up on Freitas during their single telephone conversation and only met him in person the day

26  she took the stand.  RT 1280.

1    The court found that Frietas had misrepresented his dealings with Thomas, but

2  acknowledged that Thomas "doesn't want to speak to anybody at this point."  RT 1310.

3    At a renewed hearing on the question, the prosecutor recalled Thomas, confirmed

4  that during the telephone conversation with Freitas, she had refused to provide any identifying

5  information, even the state where she was living.  RT 1377.  She acknowledged that Freitas told

6  her he could give information about her to the defense and she said she did not want that given to

7  the defense and did not want to talk to them.  RT 1378.

8    Detective Ballard then described the number of contacts he had with Thomas's

9  mother in an attempt to locate her and with Thomas herself in an attempt to persuade her to

10  cooperate.  RT 1385-1386.  Ballard told Thomas's mother he wanted to ask Thomas if she

11  wanted to speak to the defense.  RT 1387.  The mother reported back to Ballard that Thomas did

12  not want to cooperate or participate in the criminal proceedings.  RT 1388.

13    A prosecutor's interference with defense counsel's contact with a witness is

14  misconduct.  United States v. Henao, 652 F.2d 591, 592-93 (5th Cir. 1981).  However, based on

15  this record, particularly on the fact that Thomas never testified she would have consented to a

16  defense interview had she been asked and her overall desire not to cooperate, this court cannot

17  say the Court of Appeal made an unreasonable determination of fact in finding there had been no

18  prosecutorial misconduct in its dealings with Ann Thomas, witness no. 5.

19    C.  Date Of The Blood Draw

20    On December 14, 1998, Silvia told the court that prosecutor Freitas had just given

21  him a report from Officer Eduardo Rodriguez, noting that Vasquez's blood had been drawn on

22  June 12, 1997 rather than June 26, as he had earlier reported.  RT 695.[9]

23    The court held a hearing the next day.  Rodriguez testified he was present on June

24  12 when petitioner's blood was drawn and he booked the vial of blood into evidence.  RT 856-

25  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

26    [9]  Laboratory reports gave the results of testing of blood drawn on June 12, 1997.  RT 695.

857.  He did not write a report about the event until October 1998, when a supervisor asked him to do so.  RT 862.  When he wrote the report, he made a mistake and listed the date of the blood draw as June 26, 1997.  RT 864, 866.  He used this date because the computerized record system suggested this was the day Vasquez was booked into the jail.  RT 865.  Rodriguez was certain, however, that the blood was drawn June 12, because the evidence tag on the blood was dated June 12.  RT 865.

During trial, Officer Jose Martinez testified he and Rodriguez took Vasquez to the hospital to have his blood drawn on June 12, 1997.  RT 1617-1618.  He was certain about the date because it was written on the blood vial, the packaging for the vial, and the property card.  RT 1624.  The Court of Appeal's conclusion that there was no intentional falsification of Rodriguez's report is not an unreasonable determination of the facts.  Compare Sanders v. Lamarque, 357 F.3d 943, 950 (9th Cir. 2004).

    D.  Xavier Lozano

Xavier Lozano had been arrested in 1997 for his involvement in the Yum Yum Donuts robbery and had entered into a cooperation agreement with state and federal authorities.  RT 2796-2798.  The prosecutor had placed Lozano's name on his witness list on December 11, 1998, after heated debate about the admissibility of gang expert testimony on the relationship between killing a gang dropout and acceptance into and respect from the gang.  RT 673.  Freitas explained Garcia was preparing a report on the latest interview with Lozano and would provide defense counsel with a copy as soon as it was ready.  RT 673.

The following Monday, December 14, Hansen notified the court that the public defender's office had represented Lozano when the cooperation agreement was prepared and that Freitas had told her over a year before that he would not call Lozano as a witness.  RT 793.  Freitas countered that he had not planned to use Lozano until he ran into evidentiary problems with the gang expert's testimony about the importance of killing a dropout.  RT 794.  The court ruled that the prosecutor could not call Lozano because of the potential conflict, but noted the

1   question could be addressed again if things changed.  RT 794-795.

2           The prosecutor submitted case authority to the court on the conflict of interest and

3   on Wednesday, January 6, 1999, repeated his desire to call Lozano as a witness.  RT 2039.  The

4   court found there would be no conflict of interest.  RT 2042, 2052.  Freitas then said he was not

5   going to call Lozano until Friday at the earliest.  RT 2042.

6           Silvia objected, saying he had done nothing to prepare for cross-examination of

7   Lozano.  The court noted the issue of discovery might bar Lozano from the stand, but it was not

8   able to address the question absent more information.  RT 2065-2066.  By the end of Friday,

9   January 8, defense counsel reported they had just received 350 pages of discovery on Lozano.

10  RT 2337-2338.  On Tuesday, January 12, Silvia reported he had been unable to review the 350

11  pages of Lozano materials.  RT 2511.  By Wednesday, an additional fifty-five pages of discovery

12  had been provided.  RT 2793.

13          Lozano took the stand Wednesday afternoon, January 13.  RT 2796.  Defense

14  counsel refused to cross-examine him.  RT 2808, 2810-2811.  The court nevertheless found there

15  had been sufficient time to prepare for cross-examination.  RT 2811.

16          The Court of Appeal found that the prosecution had not misled the defense about

17  calling Lozano as a witness, a finding which is not a clearly unreasonable determination of fact.

18  Even if there was misconduct, petitioner has not borne his burden of showing prejudice.

19          In general, a prosecutor's actions will be grounds for habeas relief if they "'so

20  infected the trial with unfairness as to make the resulting conviction a denial of due process.'"

21  Darden v. Wainwright, 477 U.S. 168, 180 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S.

22  637 (1974)).  Silvia complained that the prosecutor's last-minute decision to call Lozano as a

23  witness and the subsequent late release of discovery materials prevented him from preparing an

24  adequate cross-examination.  However, in Pennsylvania v. Ritchie, 480 U.S. 39, 52 (1987), the

25  Supreme Court recognized that the confrontation clause establishes a trial right, not a right of

26  pretrial discovery.  Accordingly, the prosecution's late release of discovery concerning Lozano

1   did not deny petitioner his Sixth Amendment rights.  Moreover, because petitioner has presented

2   nothing suggesting what he would have asked Lozano had he been given more time to prepare,

3   he has not borne his burden of demonstrating any unfairness from the prosecutor's actions.

4   VI.  Incorporating Trent's Petition (Ground Four)

5           Petitioner asks that the court consider the issues raised in his co-defendant's

6   petition, filed in Trent v. McGrath, Civ. No. S-02-1647 DFL PAN P.  Am. Pet. at 21-22.

7   However,

8           in order to substantially comply with the Section 2254 Rule 2(c), a
            petitioner must state specific, particularized facts which entitle him
9           or her to habeas corpus relief for each ground specified.  These
            facts must consist of sufficient detail to allow the court to
10          determine, from the face of the petition alone, whether the petition
            merits further habeas corpus review.

11

12   Adams v. Armontrout, 897 F.2d 332, 334 (8th Cir. 1990).  Accordingly, asking the court to refer

13   to documents not included with the petition is insufficient to require the court to determine

14   whether any of the grounds so referenced entitle petitioner to relief.

15           Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a

16   writ of habeas corpus be denied.

17   /////

18   /////

19   /////

20   /////

21   /////

22   /////

23   /////

24   /////

25   /////

26   /////

1    These findings and recommendations are submitted to the United States District

2 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

3 days after being served with these findings and recommendations, any party may file written

4 objections with the court and serve a copy on all parties.  Such a document should be captioned

5 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

6 shall be served and filed within ten days after service of the objections.  The parties are advised

7 that failure to file objections within the specified time may waive the right to appeal the District

8 Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

9 DATED:  August 19, 2005.


UNITED STATES MAGISTRATE JUDGE

2/vasq1925.157

23